(No. 40496.—

NATIONAL CASTINGS Co., Appellant, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(Robert Gibson, Appellee.)

*Opinion filed November 22, 1968.*

JOHN J. GILL, RAYMOND J. KELLEY, and SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, all of Chicago, for appellant.

JERALD A. LAVIN, and GOLDSTEIN & GOLDBERG, both of Chicago, for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Respondent, National Castings Co., appeals from a Cook County circuit court judgment confirming a workmen's compensation award to its employee, claimant Robert Gibson, based upon the finding of the arbitrator and Industrial Commission that claimant was totally and permanently disabled.

On June 3, 1963, claimant was employed by respondent as a "chipper" and "grinder" whose duty it was to remove excess metal from castings. While thus engaged claimant went to the departmental water fountain to get a drink. He placed his right hand on a Magnaflux machine (an electronic machine used to detect cracks in metal castings) standing next to the fountain, and, with his left hand on the metal rim of the fountain, he commenced drinking. While in this position he experienced an electric shock and jerked his left hand away from the fountain, but was unable to free his right hand from the machine. He called for help and remembers nothing further until four or five days later in the hospital.

Edward Dickey, who worked in the same department as claimant, testified he heard claimant "holler", saw "blue fire" around claimant's hand on the Magnaflux machine, grabbed claimant's left arm to pull him away and was "knocked down" by the electric current. Dickey arose from the floor and pulled the switch, cutting the current to the machine, and Gibson fell to the floor unconscious. Claimant was then taken to the plant doctor's office and thence to the hospital, where he remained largely irrational for some four or five days during which time he was strapped to the bed. Dr. Joseph Luhan testified he saw claimant in the hospital emergency room on the day of the injury, that he then "appeared to be unable to speak or move his limbs and answered questions by moving his eyelids and he had no reflexes such as knee jerks or abdominal reflexes or plantar reflexes. The heart and blood pressure were normal. Then I saw jerking of the abdominal muscles." Dr. Luhan further

testified that claimant became so disturbed the doctor recommended his transfer to the Cook County Mental Health Clinic, but that this was not done because tranquilizing medication later calmed him. The jerking motions involving pelvic, trunk and head motions continued and were described by the doctor as "like an exaggerated Elvis Presley contortion." Claimant was discharged from the hospital June 24, and has not been employed since. Dr. Luhan saw claimant with decreasing frequency until October 2, 1964, during which time the jerking motion persisted. The doctor testified these movements of the abdominal muscles occurred at the rate of 1 or 2 per second and were sometimes sufficient to jerk claimant's head. They would sometimes stop completely for periods as long as 10 seconds. They were more severe when claimant was under tension. Various drugs had been tried with no appreciable effect on the jerking, although the acute mental state had been relieved, but claimant seemed to get worse when the tranquilizing and muscle relaxing medication was stopped.

Claimant testified that prior to June 3, 1963, he had never had anything similar to this jerking movement; that at the time of the hearing before the arbitrator he was taking medication four times a day but would take it more often "if I am shaking bad"; that he tried to help his wife around the house by sweeping the floor, wiping dishes, *etc.,* but the shaking caused him to break the dishes, and the exertion involved in sweeping or moving furniture hurt his back and made him "shake" more; that he spends most of his time in bed or sitting in the house but usually walks 4 or 5 blocks each day; that the jerking had continued since leaving the hospital—that it occasionally stops, sometimes several times in one day but never for longer than 5 or 10 minutes. Claimant admitted on cross-examination that he had driven his wife 15 or 20 blocks to work "practically every day" during the month prior to the hearing; that since the accident he had been arrested for driving

through a stop light and while under the influence of liquor, and his driver's license had been revoked. He stated his jerking continued during the time he was in the custody of the arresting officers, and that his jerking sometimes continued while he was driving a car. Claimant further testified he sometimes goes to the Zodiac Tavern on week-ends—that he "feels better" after having several beers.

Dr. Luhan also stated he had wanted to place claimant under sodium pentothal or amytal and examine him under drug-induced hypnosis in order to resolve the question as to how much of the movement was organic and how much due to auto suggestion, but that claimant refused to consent.

The doctor concluded by stating that the myoclonus (abdominal muscle jerking) "might very well" have resulted from the conversion reaction diagnosed at the time of his first examination, but he could not be "certain that it is". He was unable to determine whether the cause was organic or functional. If the former, it could be permanent; if the latter, it was more likely to stop. He "inclined to think it is functional". He thought "there is a causal connection" between the electric shock and the myoclonus. Based in part on observation of the patient and in part on history (which apparently involved a statement by claimant that he could not drive a car or an assumption by the doctor that he could not) it was the doctor's opinion that claimant "could not do anything", and that the myoclonus was involuntary. When asked whether the fact that claimant drove his wife to work with some regularity would change his opinion, Dr. Luhan responded that if claimant was able to drive regularly without the use of alcohol, this fact "would incline me to think there certainly must be a volitional cause for the jerking."

Dr. Alex J. Arieff, a specialist in neurology and psychiatry, first saw claimant on November 14, 1963, at which time he diagnosed his condition as a neurosis of the hysterical type. He saw him again in February, 1965, at which

time the doctor found nothing different. Claimant "still had that same type of hyperkinesia, that is, increased movement shaking to and fro". In response to a hypothetical question incorporating the testimony regarding the accident and claimant's subsequent condition, Dr. Arieff stated his opinion that "there is a definite relationship" between the injury and that condition. He further testified the condition "might or could be permanent" and that the fact claimant could drive a car was not incompatible with his diagnosis.

Claimant's wife testified she first saw her husband following the accident in the hospital later that same day. He was jerking, irrational, strapped to the bed and did not recognize her until June 7. After he returned home the jerking continued; she let him try to help around the house, but he seemed to get worse when he did; that he broke some of the dishes and that the jerking interferred with his sweeping; that sometimes the jerking stopped when he drove, and that it sometimes stopped when he slept.

Respondent's evidence consisted of testimony by a Chicago police officer and two employees of John T. Lynch and Company, a private investigating firm. The latter was employed by respondent to conduct a surveillance of claimant's activities. The officer testified that on June 30, 1965, he received a call that "a man is chasing a woman and taking her clothes off" in the vicinity of claimant's home. When he arrived, Mrs. Gibson was sitting in the back seat of another squad car "with her clothes torn from her body"; claimant was located not far away and arrested. He remained in the custody of the officers from 30 to 45 minutes before a squadrol arrived during which time the officer noticed nothing unusual about claimant other than that he had been drinking.

Edward Kirby and Norman Young testified that they were employees of the Lynch firm. The substance of their testimony was that claimant had been observed by one or both of them on numerous occasions when no visible ab-

normalities were apparent. Kirby stated he first saw claimant in the waiting room at the Industrial Commission offices on March 31, 1965, and noticed he was shaking badly, there were "terrific" contortions of his stomach area and he walked with a slow, shuffling gait; that he observed claimant leave the building later, walk a short distance, stop, straighten up, turn around, look back over his shoulder towards the building entrance for 30 to 40 seconds and then run across the street to a parking lot where he got into his car and drove away; that after he had stopped and looked back, claimant walked in a normal manner with nothing unusual in his appearance. On April 6 the witness again saw claimant; on that day claimant drove his wife and several others to work, came home and walked about the neighborhood, stopping to talk with several people. There were no abnormal movements observed. The witness was in the vicinity of claimant's home on April 16 but did not see him. On April 19 claimant was again observed driving his wife and several others and later that day was seen walking in the neighborhood of his home. On that occasion 16 mm color movies were taken of claimant by investigator Young. Neither investigator noticed any abnormality in claimant's walk or the movements of his body. The movie film was exhibited before the arbitrator but has since disappeared and is not available for our inspection.

We have detailed the testimony at some length since respondent strenuously argues that claimant is a malingerer and that the peculiar jerking movements of his torso are voluntarily induced by claimant as a means of securing compensation. It is, of course, possible that this is true. But the agency charged with the initial responsibility for making that determination—based, in large measure, upon an assessment of the credibility of the witnesses—has said that it is not true. That determination has been confirmed by the Commission and upheld by the trial court. The prob-

lem before us is whether that determination may now fairly be said to be against the manifest weight of the evidence, for we may reverse the Commission in its findings of fact only if such findings are against the manifest weight of the evidence. It is clear that such is not the case here.

There is no doubt on this record that claimant received a severe electrical shock; nor is there any doubt that the onset of the jerking movments occurred thereafter while claimant was hospitalized and irrational. Whether their continued presence is voluntary or involuntary is disputed, but under our decisions there certainly is adequate testimonial basis, both medical and otherwise, to support the finding that claimant's present condition is involuntary and causally connected with the accidental injury. *City of Herrin* v. *Industrial Com.*, 40 Ill.2d 554; *Gould* v. *Industrial Com.*, 40 Ill.2d 548; *Tempco Products Co.* v. *Industrial Com.*, 40 Ill.2d 539.

The judgment of the Cook County circuit court is affirmed.

*Judgment affirmed.*